UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | ) | DOCKET NO. |
| THE PROPERTY AND CASUALTY INITIATIVE, LLC, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA acting through the NATIONAL CREDIT UNION ADMINISTRATION, | ) | |
| Defendant | ) | |

## AMENDED VERIFIED COMPLAINT

1.      The Plaintiff, The Property and Casualty Initiative, LLC ("PCI") is a Massachusetts limited liability company with a usual place of business in Boston, Suffolk County, Massachusetts and was formerly known as The Massachusetts Property and Casualty Insurance Company Community and Economic Development Initiative, LLC.  PCI was formed as a result of certain enabling legislation (1998 Mass. Acts ch. 259, §3) as a vehicle for Massachusetts-based property and casualty insurance companies, to reinvest funds into the Commonwealth's poorer communities.  Among its activities, PCI makes loans for low-income housing developments, economic development projects, community health centers and small businesses located in Massachusetts.

2.      The Defendant, United States of America, acting through the National Credit Union Administration  ("NCUA") is an independent federal agency that charters and supervises federal credit unions.  The NCUA was appointed first as Conservator, then on May 17, 2003 as Liquidating Agent of the D. Edward Wells Federal Credit Union (the "Credit Union") and

succeeded to all right, title and interest of the Credit Union by operation of law. The NCUA has a regional office in Albany, New York.

3.      This Court has jurisdiction over this matter pursuant to Section 207(b)(13)(D) of the Federal Credit Union Act, as amended, 28 U.S.C. §1331, 12 U.S.C. §1789(a)(2) and the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b). Venue is proper under 28 U.S.C. §1391(e)(2).

4.      In connection with its public purpose charter, PCI provided a revolving loan arrangement of up to $2 Million with the Community Focus Loan Fund (the "Fund") and The Friends of the Credit Union, Inc. ("Friends") which was closed on October 11, 2000 (the "Friends Loan").

5.      Advances under the Friends Loan were to be used by the Fund and Friends to make small loans to people and businesses in the greater Springfield area on terms and conditions set forth in the relevant loan documents. These downstream loans are commonly referred to as "Community Loans."

6.      As an administrative matter, PCI and Friends agreed to fund the Friends Loan in two installments to a deposit account in the Fund's name maintained at the Credit Union (the "Operating Account"). The second installment was to be advanced after the Fund had utilized the initial advance to make Community Loans.

7.      As security for the Friends Loan, PCI was granted a first priority, perfected security interest in various assets of the Fund and Friends. The collateral securing the Friends Loan included, among other things:

(i)      the notes and collateral documents constituting the Community Loans;

2

(ii)    a pledge of all amounts kept on deposit in the Loan Loss Reserve Deposit Account (Account No. 80081) which the Loan Documents required be established by Friends with the Credit Union and into which Friends was required to deposit a minimum of ten percent (10%) of the principal balance of the Community Loans and other investments held for Pledgor by such credit union (the "LLR Account"); and

(iii)    a pledge of amounts on deposit in the Operating Account maintained by the Friends with the Credit Union and other investments held for Pledgor by such Credit Union.

The Operating Account and the LLR Account are sometimes collectively referred to herein as the "Deposit Accounts."

8.    These pledges were established pursuant to a Loan Loss Reserve Pledge Agreement and a separate Pledge Agreement (collectively, the "Pledge Agreements") executed in connection with the Friends Loan. Copies of the Pledge Agreements are attached as Exhibits "A" and "B," respectively.

9.    The Credit Union acknowledged the pledges of the Deposit Accounts to PCI by joining as a party to each of the Pledge Agreements. By joining in the Pledge Agreements, the Credit Union agreed to immediately pay over to PCI, upon demand, any funds on deposit in the Deposit Accounts.

10.    The NCUA was appointed Conservator of the Credit Union on or about February 21, 2003.

11.    On March 21, 2003, the then president of the Friends attempted to withdraw the funds held in its accounts at the Credit Union. In response, he was told by an NCUA agent that the funds would not be released until the NCUA had verified the balances in the accounts. He then requested from the NCUA agent a printout of the balances in the accounts as of that date.

3

12.     At the time of this request for the withdrawal and/or transfer of the funds, the accounts at issue contained $630,865.25. A print-out of the balances in the account at that time is attached hereto as Exhibit "C."

13.     Thereafter, also on or about March 21, 2003, PCI sent notice to the Friends, the Credit Union, and NCUA as Conservator that it (PCI) elected to exercise its rights and remedies under Sections 6 and 7 of the Pledge Agreements, and made demand upon the Friends and the Credit Union that all funds on deposit in the Deposit Accounts be paid immediately to PCI. A copy of the March 21 demand is attached as Exhibit "D."

14.     On May 5, 2003, PCI again made demand upon the NCUA, as Conservator of the Credit Union, for payment of all amounts on deposit in the Deposit Accounts. A copy of the May 5 demand is attached as Exhibit "E."

15.     In response to PCI's written and oral requests for release of its funds, the NCUA as Conservator of the Credit Union made promises of an imminent release of the funds, provided PCI file additional forms or direct its requests to different individuals at the NCUA.

16.     PCI's demands regarding the funds on deposit were ignored and disregarded by the NCUA while it was serving as Conservator of the Credit Union and the funds at issue were never released.

### COUNT I: CONVERSION

17.     The NCUA had no basis in fact or at law to disregard the clear instructions and directions of PCI. The NCUA's failure and refusal to release the funds in question was tortious and improper.

18.    The exercise of dominion over said funds by the NCUA constitutes a conversion of PCI's funds.

19.    On or about May 17, 2003, the NCUA became the Liquidator of the Credit Union. NCUA then took the position that it no longer had any responsibility to honor PCI's or the Fund's claim to the funds in the depository accounts of the Credit Union and that even if it were obligated to do so, its duty was limited by the $100,000 insurance cap for depositors of failed financial institutions.

20.    On or about May 22, 2003, PCI again made demand upon the NCUA, as Liquidator of the Credit Union, for payment of all amounts on deposit in the Deposit Accounts. A copy of the May 22 demand is attached as Exhibit "F."

21.    Upon information and belief, when the NCUA refused to honor, or permit the Credit Union to honor, requests for the funds by the Fund and PCI prior to and during the NCUA's reign as Conservator, the NCUA intended to delay and to maintain control of the funds at issue until it was appointed Liquidating Agent.

22.    The NCUA's conduct, including its exercise of wrongful dominion over the funds, constituted, and continues to constitute, conversion.

23.    As a direct and proximate result of the actions of the conversion of funds by the NCUA, the Plaintiff has sustained damages.

24.    The Plaintiff satisfied its obligation to file an administrative claim with the NCUA within the time required under 28 U.S.C. § 2401(b).

25.    By letter dated March 15, 2005, the NCUA essentially denied PCI's claim for the return of its funds, by conditioning payment of $100,000 in insurance proceeds on PCI's execution of a general release of all claims.  A copy of this March 2005 NCUA letter is attached as Exhibit "G."

## COUNT II: CONSTITUTIONAL CLAIM

26.    By depriving the Plaintiff of its funds unjustifiably, the NCUA, and the individuals at the NCUA who took such action, violated the Plaintiff's rights under the 5th Amendment of the United States Constitution, which prohibits the taking of private property without just compensation.

27.    By depriving the Plaintiff of its Constitutional rights, the NCUA and the individuals at the NCUA who took such action, violated 42 U.S.C. § 1983.

28.    As a direct and proximate result of the actions of the NCUA and the individuals at the NCUA who took such action, the Plaintiff has sustained damages.

## Count III: FAILURE TO PAY ON DEPOSIT INSURANCE

29.    Despite its obligation to do so, the NCUA has neglected failed and refused to pay PCI even the $100,000 of the account maintained in federally insured deposits it is entitled to under Section 207 of the FCU Act (12 U.S.C. §1787(k)(1)) and Part 745 of the NCUA Rules and Regulations (12 C.F.R 745).

30.    As set forth in the March 2005 letter, NCUA impermissibly sought to condition payment of the said $100,000 insured amount on signing a full release of any and all claims it might have against the NCUA.  See Exhibit G.

**Count IV: NEGLIGENCE**

31.    As conservator of the Credit Union, the NCUA owed a duty of care to the depositors of the Credit Union, including PCI (and its borrowers, the Fund and Friends) to release funds on deposit upon a lawful request for them.

32.    The NCUA, as conservator breached its duty to care in failing to release to PCI the funds on deposit with the Credit Union to which PCI had a right of withdrawal.

33.    As a direct and proximate result of such breach, PCI suffered damages in the amount of the funds on deposit taken by the NCUA when it became the liquidator of the Credit Union.

**Count V: BREACH OF FIDUCIARY DUTY**

34.    The NCUA, as conservator, owed PCI and all other depositors a fiduciary duty to manage the Credit Union for their benefit.

35.    Included in such fiduciary duty was a duty to release funds on deposit to its depositors and those entitled to withdraw such funds, without delay or unreasonable obstacles.

36.    In failing to release the funds to PCI (and before it to Friends) despite proper requests that it do so, the NCUA, as conservator breached its fiduciary duties to PCI, thereby causing PCI damages in the amount of the funds seized by the NCUA when it became the Liquidator of the Credit Union.

**Count VI: NEGLIGENT MISREPRESENTATION**

37.    When the NCUA, as conservator, responded to PCI's oral and written requests to withdraw its funds on deposit at the Credit Union, with assurances that the funds would be released shortly, it did so intending that PCI rely thereon.

7

38.    PCI did rely on said representations.

39.    At the time it made said representations, the NCUA knew or should have known that such representation was untrue and yet made it anyway, without determining whether it was true or false.

40.    As a result of the NCUA's negligent misrepresentations, PCI sustained damages in the form of the loss of the funds on deposit at the Credit Union.

WHEREFORE, the Plaintiff, The Property and Casualty Initiative, LLC, requests that the Court:

1.    Enter judgment in its favor and against the Defendant, United States of America acting through the National Credit Union Administration, in the amount of all damages sustained, including but not limited to the amount of funds in the Deposit Accounts on March 21, 2003, at the time of the initial demand.

2.    Award the Plaintiff its attorneys' fees against the NCUA pursuant to 42 U.S.C. § 1983.

3.    Grant such other relief as the Court deems just.

By its attorneys,

Richard E. Gentilli
BBO # 189080
Frank F. McGinn
BBO # 564729
Bartlett Hackett Feinberg P.C.
10 High Street, Suite 920
Boston, MA 02110
617/422-0200

Dated:  September 6, 2005

8

# EXHIBIT A

# THE MASSACHUSETTS PROPERTY AND CASUALTY INSURANCE COMPANY
## COMMUNITY AND ECONOMIC DEVELOPMENT INITIATIVE, LLC
### PLEDGE AGREEMENT

This AGREEMENT is entered into at Boston, Massachusetts, as of October *11*, 2000 by and between FRIENDS OF THE CREDIT UNION, INC., a corporation organized under Chapter 180 of the Massachusetts General Laws with an address c/o The D. Edward Wells Federal Credit Union, 864 State Street, Springfield, Massachusetts, for itself and the Community Focus Loan Fund (collectively, the "Pledgor") and THE MASSACHUSETTS PROPERTY AND CASUALTY INSURANCE COMPANY COMMUNITY AND ECONOMIC DEVELOPMENT INITIATIVE, LLC, (the "Lender"). The Lender has made or shall make a $2.0 Million Loan (the "PCI Loan") available to the Pledgor, as agent for the Community Focus Loan Fund, the proceeds of which shall be used by the Pledgor to make commercial loans to borrowers in the communities of Springfield and Holyoke, Massachusetts, which loans have been or will be collaterally assigned to Lender ("Customer Loans") in accordance with the provisions of a Loan and Security Agreement between the Pledgor and Lender of even date herewith (the "Loan Agreement").

In order to facilitate the funding of Customer Loans by the Pledgor, the Lender shall make an initial advance of $1.0 Million under the PCI Loan (the "Initial Advance"), proceeds of which shall be deposited by the Pledgor in a deposit account no. *998859* maintained by the Pledgor with The D. Edward Wells Federal Credit Union, or in other investments held for Pledgor by such credit union (collectively, the "Deposit Account"). Proceeds of the Initial Advance will be disbursed from the Deposit Account to the Pledgor to enable it to fund Customer Loans. Provided that (i) the Pledgor is not in default of its Obligations and that (ii) at least $750,000 of the Initial Advance has been used by the Pledgor to make Eligible Loans on or before the first anniversary date of the Loan Agreement, the Lender will advance to the Pledgor an additional $1.0 Million under the PCI Loan (the "Second Advance" and with the Initial Advance, the "Advances"), proceeds of which Second Advance shall be deposited to the Deposit Account. Proceeds of the Second Advance will be disbursed from the Deposit Account to the Pledgor to enable it to fund Customer Loans. Pending disbursement of the Advances by the Pledgor to fund Eligible Customer Loans, the Advances and the Account are hereby pledged to the Lender as additional collateral security for the Obligations.

1

1.    **Pledge**. In consideration of the foregoing recitals and for other good and valuable consideration, the Pledgor hereby grants to the Lender a security interest in and pledge of all of the Pledgor's Collateral. The security interest granted by this Agreement is given to and shall be held by the Lender as security for the payment and performance of all Obligations. The Lender shall have the unrestricted right from time to time to apply (or to change any application already made of) the proceeds of any of the Collateral to any of the Obligations, as the Lender in its sole discretion may determine.

2.    **Definitions**. The following definitions shall apply:

"Collateral" shall mean all the Pledgor's present and future right, title and interest in and to all monies from time to time on deposit in the Deposit Account, all of Pledgor's present and future right, title and interest in the Deposit Account, and all interest and dividends thereon, all additions and deposits thereto and all proceeds thereof.

"Obligation(s)" shall include without limitation Pledgor's obligations and liabilities to the Lender pursuant to the Loan Agreement, including without limitation thereof Borrower's obligations pursuant to the PCI Loan, and all other loans, advances, indebtedness, notes, liabilities and amounts, liquidated or unliquidated, owing by the Pledgor to the Lender at any time, of each and every kind, nature and description, whether arising under the Loan Agreement, this Agreement or otherwise, and whether secured or unsecured, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter contracted. Said term shall also include all interest and other charges chargeable to the Pledgor or due from the Pledgor to the Lender from time to time and all costs and expenses referred to in this Agreement.

"Person" or "party" shall include individuals, firms, corporations and all other entities.

"Event of Default" shall mean the occurrence of any one or more of the following events:

    (i)  default of any liability, obligation or undertaking of the Pledgor to the Lender, hereunder or otherwise; or

    (ii)  occurrence of an Event of Default under the Loan Agreement.

"Undisbursed Portion of the Advances" that portion of the Advances which has not been disbursed to a Customer of the Pledgor in connection with the making to such Customer by the Pledgor of an Customer Loan in accordance with the provisions of the Loan Agreement.

"Customer Loan" a Customer Loan conforming in all respects to the definition of Customer Loan contained in the Loan Agreement.

    All words and terms used in this Agreement other than those specifically defined herein shall have the meanings accorded to them in the Loan Agreement, or if not defined in the Loan Agreement, then the meanings ascribed to them in the Massachusetts Uniform Commercial Code (General Law, Chapter 106), as amended from time to time (herein the "Code").

3.    **Costs and Expenses**. The Pledgor shall pay to the Lender any and all costs and expenses (including, without limitation, reasonable attorneys' fees, court costs, litigation and other

2

expenses) incurred or paid by the Lender in establishing, maintaining, protecting or enforcing any of the Lender's rights or the Obligations, including, without limitation, any and all such costs and expenses incurred or paid by the Lender in defending the Lender's security interest in, title or right to the Collateral or in collecting or attempting to collect or enforcing or attempting to enforce payment of the Collateral.

4.     **Title.** The Pledgor represents that the Collateral is held and owned by the Pledgor free and clear of all liens, encumbrances, attachments, security interests, pledges and charges, and if the Collateral is securities, is fully paid for and non-assessable. The Pledgor represents that the Collateral is not subject to any restriction or limitation which would prevent or limit the Pledgor's right to Pledge the Collateral to the Lender.

5.     **Affirmative Covenants.** The Pledgor shall:

(i)   execute all such instruments, documents and papers, and will do all such acts as the Lender may request from time to time to carry into effect the provisions and intent of this Agreement, including, without limitation, the execution of such control or custodial agreements as the Lender may require with respect to any Collateral held by any financial intermediary, any stock transfer orders, stock powers, notifications to obligors on the Collateral, the providing of notification in connection with book entry securities or general intangibles and the providing of instructions to the issuers of uncertificated securities or financial intermediaries, and will do all such other acts as the Lender may request with respect to the perfection and protection of the security interest granted herein and the assignment effected hereby;

(ii)   keep the Collateral free and clear of all liens, encumbrances, attachments, security interests, pledges and charges, and maintain a balance on deposit in the Deposit Account equal to 100% of the Undisbursed Portion of the Advances;

(iii)   deliver to the Lender, if and when received by the Pledgor, any item representing or constituting any of the Collateral, including, without limitation, all cash dividends and all stock certificates whether now existing or hereafter received as a result of any distribution with respect to the Collateral or otherwise;

(iv)   upon the request of the Lender, cause the issuer of any uncertificated securities distributed with respect to or comprising any of the Collateral to issue certificates with respect thereto;

(v)   upon the request of the Lender, cause certificated securities distributed with respect to or comprising any of the Collateral to be issued in the name of the Lender, as pledgee;

(vi)   not cause or permit any of the Collateral presently evidenced by a written certificate to be converted to uncertificated securities; and

(vii)   not exercise any right with respect to the Collateral which would dilute or adversely affect the Lender's rights in the Collateral.

6.     **Power of Attorney.** The Pledgor hereby irrevocably constitutes and appoints the Lender as the Pledgor's true and lawful attorney, with full power of substitution at the sole cost and expense of the Pledgor but for the sole benefit of the Lender, to endorse in favor of the Lender

any of the Collateral; cause the transfer of any of the Collateral in such name as the Lender may, from time to time, determine; to renew, extend or roll over any Collateral; and make demand and initiate actions to enforce or cause the distribution of any of the Collateral. The Lender may take such action with respect to the Collateral as the Lender may reasonably determine to be necessary to protect and preserve its interests in the Collateral. The Lender shall also have and may exercise at any time all rights, remedies, powers, privileges and discretions of the Pledgor with respect to and under the Collateral. Except as limited above, all the rights, remedies, powers, privileges and discretions included in this Paragraph may be exercised by the Lender only after an Event of Default has occurred and is continuing. The within designation, being coupled with an interest, is irrevocable until the within Agreement is terminated by a written instrument executed by a duly authorized officer of the Lender. The power of attorney shall not be affected by subsequent disability or incapacity of the Pledgor. The Lender shall not be liable for any act or omission to act pursuant to this Paragraph except for any act or omission to act which is in actual bad faith.

7.    **Default/Remedies.** If an Event of Default shall occur, at the election of the Lender, all Obligations shall become immediately due and payable without notice or demand, except with respect to Obligations payable on demand, which shall be due and payable on demand, whether or not an Event of Default has occurred. The Lender is hereby authorized, at its election, after an Event of Default or after demand, without any further demand or notice except to such extent as notice may be required by applicable law, to apply the balance of the Deposit Account against the Obligations, to sell or otherwise dispose of all or any of the Collateral at public or private sale and/or enforce and collect the Collateral; and the Lender may also exercise any and all other rights and remedies of a secured party under the Code or which are otherwise accorded to it by applicable law, all as the Lender may determine. If notice of a sale or other action by the Lender is required by applicable law, the Pledgor agrees that five (5) days' written notice to the Pledgor, or the shortest period of written notice permitted by law, whichever is larger, shall be sufficient notice; and that to the extent permitted by law, the Lender, its officers, attorneys and agents may bid and become purchasers at any such sale, if public, and may purchase at any private sale any of the Collateral that is of a type customarily sold on a recognized market or which is the subject of widely distributed standard price quotations. Any sale (public or private) shall be free from any right of redemption, which the Pledgor hereby waives and releases. No purchaser at any sale (public or private) shall be responsible for the application of the purchase money. Any balance of the net proceeds of sale remaining after paying all Obligations of the Pledgor to the Lender shall be returned to the Pledgor or to such other party as may be legally entitled thereto; and if there is a deficiency, the Pledgor shall be responsible for the same, with interest. The Pledgor acknowledges that any exercise by the Lender of the Lender's rights upon default may be subject to compliance by the Lender with any statute, regulation, ordinance, directive or order of any federal, state, municipal or other governmental authority, and may impose, without limitation, any of the foregoing restricting the sale of securities. The Lender, in its sole discretion at any such sale, may restrict the prospective bidders or purchasers as to their number, nature of business and investment intentions, and may impose, without limitation, a requirement that the persons making such purchases represent and agree, to the satisfaction of the Lender, that they

4

are purchasing the Collateral for their own account, for investment, and not with a view to the distribution or resale thereof. The proceeds of any collection or of any sale or disposition of the Collateral held pursuant to this Agreement shall be applied towards the Obligations in such order and manner as the Lender determines in its sole discretion, any statute, custom or usage to the contrary notwithstanding.

8.    **Safe Custody and Exclusivity.** The Lender shall have no duty as to the Collateral or protection of the Collateral or any income or distribution thereon, beyond the safe custody of such of the Collateral as may come into the possession of the Lender, and shall have no duty as to the preservation of rights against prior parties or any other rights pertaining thereto. The Lender's Rights and Remedies (as defined herein) may be exercised without resort or regard to any other source of satisfaction of the Obligations.

9.    **Indemnification.** The Pledgor shall indemnify, defend and hold the Lender harmless of and from any claim brought or threatened against the Lender by the Pledgor, any guarantor or endorser of the Obligations, or any other person (as well as from attorneys' reasonable fees and expenses in connection therewith) on account of the Lender's relationship with the Pledgor, or any guarantor or endorser of the Obligations (each of which may be defended, compromised, settled or pursued by the Lender with counsel of the Lender's election, but at the expense of the Pledgor), except for any claim arising out of the gross negligence or willful misconduct of the Lender. The within indemnification shall survive payment of the Obligations, and/or any termination, release or discharge executed by the Lender in favor of the Pledgor.

10.    **Waivers.** The Pledgor waives notice of nonpayment, demand, presentment, protest or notice of protest of the Collateral, and all other notices, consents to any renewals or extensions of time of payment thereof, and generally waives any and all suretyship defenses and defenses in the nature thereof. No delay or omission of the Lender in exercising or enforcing any of its rights, powers, privileges, remedies, immunities or discretions (all of which are hereinafter collectively referred to as "the Lender's Rights and Remedies") hereunder shall constitute a waiver thereof; and no waiver by the Lender of any default of the Pledgor hereunder or of any demand hereunder shall operate as a waiver of any other default hereunder or any other demand hereunder. No term or provision hereof shall be waived, altered or modified except with the prior written consent of the Lender, which consent makes explicit reference to this Agreement. Except as provided in the preceding sentence, no other agreement or transaction, of whatsoever nature, entered into between the Lender and the Pledgor at any time (whether before, during or after the effective date or term of this Agreement) shall be construed in any particular as a waiver, modification or limitation of any of the Lender's Rights and Remedies under this Agreement (nor shall anything in this Agreement be construed as a waiver, modification or limitation of any of the Lender's Rights and Remedies under any such other agreement or transaction) but all the Lender's Rights and Remedies not only under the provisions of this Agreement but also under any such other agreement or transaction shall be cumulative and not alternative or exclusive, and may be exercised by the Lender at such time or times and in such order of preference as the Lender in its sole discretion may determine.

11.    **Severability.** If any provision of this Agreement or portion of such provision or the

5

Lender and agrees that such service shall in every respect be deemed effective service upon Pledgor.

17.    **JURY WAIVER.** THE PLEDGOR AND LENDER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS AGREEMENT, THE OBLIGATIONS, ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH. THE PLEDGOR CERTIFIES THAT NEITHER THE LENDER NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE LENDER WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.

**SIGNATURES APPEAR ON THE NEXT NUMBERED PAGE HEREOF.**

Executed under seal and dated October _11_, 2000.

Witness

FRIENDS OF THE CREDIT UNION, INC.

(For itself and Community Focus Loan Fund)

By: _Mary E. Spruill, Clerk_

PLEDGE AGREEMENT ACKNOWLEDGED

THE D. EDWARD WELLS FEDERAL CREDIT
UNION

By: _Carol Arango Pres/CEO_

8





MAR 21 '03  04:52PM NES

P.2

**EXHIBIT B**

# THE MASSACHUSETTS PROPERTY AND CASUALTY INSURANCE COMPANY
## COMMUNITY AND ECONOMIC DEVELOPMENT INITIATIVE, LLC
### LOAN LOSS RESERVE PLEDGE AGREEMENT

This AGREEMENT is entered into at Boston, Massachusetts, as of October *11*, 2000 by and between FRIENDS OF THE CREDIT UNION, INC., a corporation organized under Chapter 180 of the Massachusetts General Laws with an address c/o The D. Edward Wells Federal Credit Union, 864 State Street, Springfield, Massachusetts, for itself and the Community Focus Loan Fund (collectively, the "Pledgor") and THE MASSACHUSETTS PROPERTY AND CASUALTY INSURANCE COMPANY COMMUNITY AND ECONOMIC DEVELOPMENT INITIATIVE, LLC, (the "Lender"). The Lender has made or shall make a $2.0 Million Loan (the "PCI Loan") available to the Pledgor, as agent for the Community Focus Loan Fund, the proceeds of which shall be used by the Pledgor to make commercial loans to borrowers in the communities of Springfield and Holyoke, Massachusetts, which loans have been or will be collaterally assigned to Lender ("Customer Loans") in accordance with the provisions of a Loan and Security Agreement between the Pledgor and Lender of even date herewith (the "Loan Agreement").

In connection with the making of Customer Loans by the Pledgor, the Pledgor is required to establish a cash loan loss reserve (the "Loan Loss Reserve") with respect to each Customer Loan. The Loan Loss Reserve is to be in the initial amount of 5.0% of the face amount of each Customer Loan, but shall increase to 10.0% of the outstanding amount of each Customer Loan now or hereafter made on the first anniversary of the Loan Agreement. Such cash Loan Loss Reserve is to be maintained in a deposit account with The D. Edward Wells Federal Credit Union or in other investments held for Pledgor by such credit union (collectively, the "Loan Loss Reserve Deposit Account"). It is a condition of the Loan Agreement that the Loan Loss Reserve Deposit Account be pledged to the Lender by the Pledgor as Collateral for the Obligations.

1.    **Pledge.** In consideration of the foregoing recitals and for other good and valuable consideration, the Pledgor hereby grants to the Lender a security interest in and pledge of all of the Pledgor's Collateral. The security interest granted by this Agreement is given to and shall be held by the Lender as security for the payment and performance of all Obligations. The Lender shall have the unrestricted right from time to time to apply (or to change any application already made of) the proceeds of any of the Collateral to any of the Obligations, as the Lender in its sole discretion may determine.

2.    **Definitions.** The following definitions shall apply:

"Collateral" shall mean all the Pledgor's present and future right, title and interest in and to all

1

monies from time to time on deposit in the Loan Loss Reserve Deposit Account, all of Pledgor's present and future right, title and interest in the Loan Loss Reserve Deposit Account, and all interest and dividends thereon, all additions and deposits thereto and all proceeds thereof.

"Obligation(s)" shall include without limitation Pledgor's obligations and liabilities to the Lender pursuant to the Loan Agreement, including without limitation thereof Borrower's obligations pursuant to the PCI Loan, and all other loans, advances, indebtedness, notes, liabilities and amounts, liquidated or unliquidated, owing by the Pledgor to the Lender at any time, of each and every kind, nature and description, whether arising under the Loan Agreement, this Agreement or otherwise, and whether secured or unsecured, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter contracted. Said term shall also include all interest and other charges chargeable to the Pledgor or due from the Pledgor to the Lender from time to time and all costs and expenses referred to in this Agreement.

"Person" or "party" shall include individuals, firms, corporations and all other entities.

"Event of Default" shall mean the occurrence of any one or more of the following events:

(i) default of any liability, obligation or undertaking of the Pledgor to the Lender, hereunder or otherwise; or

(ii) occurrence of an Event of Default under the Loan Agreement.

"Customer Loan" a Customer Loan conforming in all respects to the definition of Customer Loan contained in the Loan Agreement.

All words and terms used in this Agreement other than those specifically defined herein shall have the meanings accorded to them in the Loan Agreement, or if not defined in the Loan Agreement, then the meanings ascribed to them in the Massachusetts Uniform Commercial Code (General Law, Chapter 106), as amended from time to time (herein the "Code").

3.    **Costs and Expenses**. The Pledgor shall pay to the Lender any and all costs and expenses (including, without limitation, reasonable attorneys' fees, court costs, litigation and other expenses) incurred or paid by the Lender in establishing, maintaining, protecting or enforcing any of the Lender's rights or the Obligations, including, without limitation, any and all such costs and expenses incurred or paid by the Lender in defending the Lender's security interest in, title or right to the Collateral or in collecting or attempting to collect or enforcing or attempting to enforce payment of the Collateral.

4.    **Title**. The Pledgor represents that the Collateral is held and owned by the Pledgor free and clear of all liens, encumbrances, attachments, security interests, pledges and charges, and if the Collateral is securities, is fully paid for and non-assessable. The Pledgor represents that the Collateral is not subject to any restriction or limitation which would prevent or limit the Pledgor's right to Pledge the Collateral to the Lender.

5.    **Affirmative Covenants**. The Pledgor shall:

(i) execute all such instruments, documents and papers, and will do all such acts as the

2

Lender may request from time to time to carry into effect the provisions and intent of this Agreement, including, without limitation, the execution of such *control or custodial agreements* as the Lender may require with respect to any Collateral held by any financial intermediary, any stock transfer orders, stock powers, notifications to obligors on the Collateral, the providing of notification in connection with book entry securities or general intangibles and the providing of instructions to the issuers of uncertificated securities or financial intermediaries, and will do all such other acts as the Lender may request with respect to the perfection and protection of the security interest granted herein and the assignment effected hereby;

(ii)   keep the Collateral free and clear of all liens, encumbrances, attachments, security interests, pledges and charges, and maintain a balance on deposit in the Loan Loss Reserve Deposit Account equal to the required Loan Loss Reserve from time to time;

(iii)   deliver to the Lender, if and when received by the Pledgor, any item representing or constituting any of the Collateral, including, without limitation, *all cash dividends and all stock* certificates whether now existing or hereafter received as a result of any distribution with respect to the Collateral or otherwise;

(iv)   upon the request of the Lender, cause the issuer of any uncertificated securities distributed with respect to or  comprising any of the Collateral to issue certificates with respect thereto;

(v)   upon the request of the Lender, cause certificated securities distributed with respect to or comprising any of the Collateral to be issued in the name of the Lender, as pledgee;

(vi)   not cause or permit any of the Collateral presently evidenced by a written certificate to be converted to uncertificated securities; and

(vii)   not exercise any right with respect to the Collateral which would dilute or adversely affect the Lender's rights in the Collateral.

6.     **Power of Attorney.**  The Pledgor hereby irrevocably constitutes and appoints the Lender as the Pledgor's true and lawful attorney, with full power of substitution at the sole cost and expense of the Pledgor but for the sole benefit of the Lender, to endorse in favor of the Lender any of the Collateral; cause the transfer of any of the Collateral in such name as the Lender may, from time to time, determine; to renew, extend or roll over any Collateral; and make demand and initiate actions to enforce or cause the distribution of any of the Collateral. The Lender may take such action with respect to the Collateral as the Lender may reasonably determine to be necessary to protect and preserve its interests in the Collateral.  The Lender shall also have and may exercise at any time all rights, remedies, powers, privileges and discretions of the Pledgor with respect to and under the Collateral.  Except as limited above, all the rights, remedies, powers, privileges and discretions included in this Paragraph may be exercised by the Lender only after an Event of Default has occurred and is continuing.  The within designation, being coupled with an interest, is irrevocable until the within Agreement is terminated by a written instrument executed by a duly authorized officer of the Lender.  The power of attorney shall not be affected by subsequent disability or incapacity of the Pledgor.  The Lender shall not be liable for any act or omission to act pursuant to this Paragraph except for any act or omission to act

3

which is in actual bad faith.

7.    **Default/Remedies.** If an Event of Default shall occur, at the election of the Lender, all Obligations shall become immediately due and payable without notice or demand, except with respect to Obligations payable on demand, which shall be due and payable on demand, whether or not an Event of Default has occurred. The Lender is hereby authorized, at its election, after an Event of Default or after demand, without any further demand or notice except to such extent as notice may be required by applicable law, to apply the balance of the Loan Loss Reserve Deposit Account against the Obligations, to sell or otherwise dispose of all or any of the Collateral at public or private sale and/or enforce and collect the Collateral; and the Lender may also exercise any and all other rights and remedies of a secured party under the Code or which are otherwise accorded to it by applicable law, all as the Lender may determine. If notice of a sale or other action by the Lender is required by applicable law, the Pledgor agrees that five (5) days' written notice to the Pledgor, or the shortest period of written notice permitted by law, whichever is larger, shall be sufficient notice; and that to the extent permitted by law, the Lender, its officers, attorneys and agents may bid and become purchasers at any such sale, if public, and may purchase at any private sale any of the Collateral that is of a type customarily sold on a recognized market or which is the subject of widely distributed standard price quotations. Any sale (public or private) shall be free from any right of redemption, which the Pledgor hereby waives and releases. No purchaser at any sale (public or private) shall be responsible for the application of the purchase money. Any balance of the net proceeds of sale remaining after paying all Obligations of the Pledgor to the Lender shall be returned to the Pledgor or to such other party as may be legally entitled thereto; and if there is a deficiency, the Pledgor shall be responsible for the same, with interest. The Pledgor acknowledges that any exercise by the Lender of the Lender's rights upon default may be subject to compliance by the Lender with any statute, regulation, ordinance, directive or order of any federal, state, municipal or other governmental authority, and may impose, without limitation, any of the foregoing restricting the sale of securities. The Lender, in its sole discretion at any such sale, may restrict the prospective bidders or purchasers as to their number, nature of business and investment intentions, and may impose, without limitation, a requirement that the persons making such purchases represent and agree, to the satisfaction of the Lender, that they are purchasing the Collateral for their own account, for investment, and not with a view to the distribution or resale thereof. The proceeds of any collection or of any sale or disposition of the Collateral held pursuant to this Agreement shall be applied towards the Obligations in such order and manner as the Lender determines in its sole discretion, any statute, custom or usage to the contrary notwithstanding.

8.    **Safe Custody and Exclusivity.** The Lender shall have no duty as to the Collateral or protection of the Collateral or any income or distribution thereon, beyond the safe custody of such of the Collateral as may come into the possession of the Lender, and shall have no duty as to the preservation of rights against prior parties or any other rights pertaining thereto. The Lender's Rights and Remedies (as defined herein) may be exercised without resort or regard to any other source of satisfaction of the Obligations.

9.    **Indemnification.** The Pledgor shall indemnify, defend and hold the Lender harmless of and from any claim brought or threatened against the Lender by the Pledgor, any guarantor or

4

endorser of the Obligations, or any other person (as well as from attorneys' reasonable fees and expenses in connection therewith) on account of the Lender's relationship with the Pledgor, or any guarantor or endorser of the Obligations (each of which may be defended, compromised, settled or pursued by the Lender with counsel of the Lender's election, but at the expense of the Pledgor), except for any claim arising out of the gross negligence or willful misconduct of the Lender. The within indemnification shall survive payment of the Obligations, and/or any termination, release or discharge executed by the Lender in favor of the Pledgor.

10.     **Waivers.** The Pledgor waives notice of nonpayment, demand, presentment, protest or notice of protest of the Collateral, and all other notices, consents to any renewals or extensions of time of payment thereof, and generally waives any and all suretyship defenses and defenses in the nature thereof. No delay or omission of the Lender in exercising or enforcing any of its rights, powers, privileges, remedies, immunities or discretions (all of which are hereinafter collectively referred to as "the Lender's Rights and Remedies") hereunder shall constitute a waiver thereof; and no waiver by the Lender of any default of the Pledgor hereunder or of any demand hereunder shall operate as a waiver of any other default hereunder or any other demand hereunder. No term or provision hereof shall be waived, altered or modified except with the prior written consent of the Lender, which consent makes explicit reference to this Agreement. Except as provided in the preceding sentence, no other agreement or transaction, of whatsoever nature, entered into between the Lender and the Pledgor at any time (whether before, during or after the effective date or term of this Agreement) shall be construed in any particular as a waiver, modification or limitation of any of the Lender's Rights and Remedies under this Agreement (nor shall anything in this Agreement be construed as a waiver, modification or limitation of any of the Lender's Rights and Remedies under any such other agreement or transaction) but all the Lender's Rights and Remedies not only under the provisions of this Agreement but also under any such other agreement or transaction shall be cumulative and not alternative or exclusive, and may be exercised by the Lender at such time or times and in such order of preference as the Lender in its sole discretion may determine.

11.     **Severability.** If any provision of this Agreement or portion of such provision or the application thereof to any person or circumstance shall to any extent be held invalid or unenforceable, the remainder of this Agreement (or the remainder of such provision) and the application thereof to other persons or circumstances shall not be affected thereby.

12.     **Binding Effect of Agreement.** This Agreement shall be binding upon and inure to the benefit of the respective heirs, executors, administrators, legal representatives, successors and assigns of the parties hereto, and shall remain in full force and effect (and the Lender shall be entitled to rely thereon) until terminated as to future transactions by written notice from either party to the other party of the termination hereof; provided that any such termination shall not release or affect any Collateral in which the Lender already has a security interest or any Obligations incurred or rights accrued hereunder prior to the effective date of such notice (as hereinafter defined) of such termination. Notwithstanding any such termination, the Lender shall have a security interest in all Collateral to secure the payment and performance of Obligations arising after such termination as a result of commitments or undertakings made or entered into by the Lender prior to such termination. The Lender may transfer and assign this Agreement and

deliver the Collateral to the assignee, who shall thereupon have all of the Lender's Rights and Remedies; and the Lender shall then be relieved and discharged of any responsibility or liability with respect to this Agreement and the Collateral.

13.     **Notices.** Any notices under or pursuant to this Agreement shall be deemed duly received and effective if delivered in hand to any officer or agent of the Pledgor or Lender, or if mailed by registered or certified mail, return receipt requested, addressed to the Pledgor or Lender at address set forth in this Agreement or as any party may from time to time designate by written notice to the other party.

14.     **Reproductions.** This Agreement and all documents which have been or may be hereinafter furnished by Pledgor to the Lender may be reproduced by the Lender by any photographic, photostatic, microfilm, xerographic or similar process, and any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business).

15.     **Massachusetts Law.** This Agreement is intended to take effect as a sealed instrument and has been executed or completed and is to be performed in Massachusetts, and it and all transactions thereunder or pursuant thereto shall be governed as to interpretation, validity, effect, rights, duties and remedies of the parties thereunder and in all other respects by the domestic laws of Massachusetts.

16.     **Jurisdiction and Venue.** Pledgor irrevocably submits to the nonexclusive jurisdiction of any federal or state court sitting in Massachusetts, over any suit, action or proceeding arising out of or relating to this Agreement. Pledgor irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum. Pledgor irrevocably consents to such process being served by mailing a copy thereof by registered or certified mail, postage prepaid, return receipt requested, to Pledgor's address shown in this Agreement or as notified to the Lender and agrees that such service shall in every respect be deemed effective service upon Pledgor.

17.     **JURY WAIVER.** THE PLEDGOR AND LENDER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS AGREEMENT, THE OBLIGATIONS, ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH. THE PLEDGOR CERTIFIES THAT NEITHER THE LENDER NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE LENDER WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.

6

~~SIGNATURES APPEAR ON THE NEXT NUMBERED PAGE.~~

Executed under seal and dated October _11_, 2000.

Witness

_Ja fill_

FRIENDS OF THE CREDIT UNION, INC.
(For itself and The Community Focus Loan Fund)

By: _Mary C. Spruill, Clerk_


PLEDGE AGREEMENT ACKNOWLEDGED
THE D. EDWARD WELLS FEDERAL CREDIT
UNION

By: _Carol Araujo Pres/CEO_

7

**EXHIBIT C**



| Shares | Amount | Code | Balance | Available | Cnt | With Fee | Lst Tr Dt | New Bal | New |
|--------|--------|------|---------|-----------|-----|----------|-----------|---------|-----|
| RG | 0.00 | 00 | 6,342.43 | 6,317.43 | 0 | 0.00 | 2/11/03 | 6,342.43 | 6,3 |
| 18 | 0.00 | 00 | 3,920.29 | 3,920.29 | 0 | 0.00 | 2/13/03 | 3,920.29 | 3,9 |
| Tot | 0.00 | 00 | 10,262.72 | 10,237.72 | 0 | 0.00 | | 10,262.72 | 10,2 |

| Loans | Amount | Code | Interest | Principal | Fee | Balance | Payoff | Sch Pmt | Due Dt |
|-------|--------|------|----------|-----------|-----|---------|--------|---------|--------|
| Tot | 0.00 | 00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |



| Shares | Amount | Code | Balance | Available | Cnt | With Fee | Lst Tr Dt | New Bal | New |
|--------|--------|------|---------|-----------|-----|----------|-----------|---------|-----|
| RG | 0.00 | 00 | 520,602.53 | 520,577.53 | 0 | 0.00 | 12/24/02 | 520,602.53 | 520,5 |
| Tot | 0.00 | 00 | 520,602.53 | 520,577.53 | 0 | 0.00 | | 520,602.53 | 520,5 |

| Loans | Amount | Code | Interest | Principal | Fee | Balance | Payoff | Sch Pmt | Due Dt | T |
|-------|--------|------|----------|-----------|-----|---------|--------|---------|--------|---|
| Tot | 0.00 | 00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | |

Mar.18. 2005  9:45AM    PCI    URBAN LEAGUE OF SPFLD INC                No.8284   P. 5/5

```
LOAN LOSS,FOCUS LN FUND                Account Number    80081
SPFLD DEPOSIT                          Current Date: 12/13/02
                                       SS #:
                                       Payroll:       0.00

Account          Share Bal    Avail Shar   Last Tr Dt   Last Tr $   Last Tr Des
     80081       100000.00    99975.00     12/06/00     100000.00   TRANSFER TO
TOTALS -         100000.00    99975.00

Ext-Typ  Ln Bal  Lst Tr Dt  Sch Pymt  Int Due    Payoff  Int-Day  Dlq Amt Due Dat
TOTAL    0.00                0.00      0.00       0.00    0.0000   0.00
```

**EXHIBIT D**

The Property and Casualty Initiative

March 21, 2003

The Friends of the Credit Union, Inc.
Community Focus Loan Fund
c/o Mary E. Spruell
423 1/2 State Street                              CERTIFIED MAIL
Springfield, Massachusetts 01109                  RETURN RECEIPT REQUESTED
                                                  AND FIRST CLASS MAIL

D. Edward Wells Federal Credit Union
National Credit Union Administration
conservator for
D. Edward Wells Federal Credit Union
864 State Street
Springfield, Massachusetts 01109

RE: Friends of the Credit Union, Inc. Deposit Accounts

Sir or Madam:

        The Property and Casualty Initiative, LLC (formerly known as The Massachusetts
Property and Casualty Insurance Company Community and Economic Development
Initiative, LLC, and referred to herein as "PCI") is secured lender to The Friends of the
Credit Union, Inc. (the "Friends") and the Community Focus Loan Fund (the "Fund")
pursuant to a revolving loan arrangement in the maximum amount of up to $2 Million which
was closed on October 11, 2000 (the "Friends Loan"). Advances under the Friends Loan
were to be used by Focus and Friends to make loans to people and businesses in the greater
Springfield area on terms and conditions set forth in the loan documents ("Community
Loans"). Pursuant to the loan documents establishing the Friends Loan, PCI was granted a
first priority perfected security interest in various assets of the Fund and Friends. The
collateral securing the Friends Loan includes, among other things,
(i) the Community Loans, (ii) a pledge of amounts on deposit in the Loan Loss Reserve
Deposit Account established by Friends with the Credit Union and into which Friends was
required to deposit a minimum of ten percent (10.0%) of the principal balance of the
Community Loans (the "LLR Account") and (iii) a pledge of amounts on deposit in
Account No. 998859 maintained by the Friends with the Credit Union and into which
undisbursed proceeds of the Friends Loan were deposited, pending closing of Community
Loans (the "Operating Account" and with the LLR Account, the "Deposit Accounts").
These pledges were established pursuant to a Loan Loss Reserve Pledge Agreement and a
separate Pledge Agreement (collectively, the "Pledge Agreements") executed in connection
with the Friends Loan. The Credit Union acknowledged the pledges of the Deposit
Accounts to PCI by joining as a party to each of the Pledge Agreements.

As a result of continuing events of default under the loan documents, PCI has elected to exercise the rights and remedies available to it under Sections 6 and 7 of the Pledge Agreements and hereby makes demand upon the Friends and the Credit Union that all funds on deposit in the Deposit Accounts be immediately remitted to PCI. Amounts on deposit in the Deposit Account should be wire transferred to the following account:

The Property and Casualty Initiative, LLC

Fleet Bank
ABA Transit Routing # 011000138
100 Federal Street
Boston, MA 02110

Account # **94198-62743**
Attention: Stacey P. Townsend

PCI expressly reserves all of the other rights and remedies available to it under the Pledge Agreement, the other loan documents and at law and in equity. PCI's acceptance of the proceeds of the Deposit Account shall in no event be deemed to constitute a cure or waiver of any existing events of default under the loan documents, or as a waiver of any of PCI's other rights and remedies, all of which are expressly reserved.

Sincerely,

Stacey P. Townsend
Executive Director

Xc: H. Thomas
    H. Flores

**EXHIBIT E**

# Bartlett Hackett Feinberg P.C.

10 High St. Suite 920
Boston, MA 02110
Tel:(617)422-0200
Fax:(617)422-0383

May 5, 2003

**Certified Mail-Return Receipt Requested**
National Credit Union Administration
conservator for D. Edward Wells Federal Credit Union
864 State Street
Springfield, Massachusetts

Regional Director
National Credit Union Administration
9 Washington Square
Washington Avenue Extension
Albany, New York, 12205

RE:    Friends of the Credit Union, Inc.
       Depository Accounts Nos.: 998859 and 80081

Sir or Madam,

Please be advised that this office represents The Property and Casualty Initiative, LLC (formerly known as The Massachusetts Property and Casualty Insurance Company Community and Economic Development Initiative, LLC, and referred to herein as "PCI".) It is our understanding that the National Credit Union Administration ("NCUA") is the Conservator for the D. Edward Wells Federal Credit Union (the "Credit Union"). PCI has asked us to write to you concerning your failure to respond to its notice of default and direction to return funds, sent to you as conservator for the Credit Union on March 21, 2003. A copy of that Notice is enclosed.

By way of a brief recitation of the facts, I report the following. PCI is the secured lender to the Community Focus Loan Fund (the "Fund") and The Friends of the Credit Union, Inc. (the "Friends") pursuant to a revolving loan arrangement of up to $2 Million which was closed in October 11, 2000 (the "Friends Loan"). Advances under the Friends Loan were to be used by Focus and Friends to make small loans to people and businesses in the greater Springfield area on terms and conditions set forth in the relevant loan documents. These downstream loans are commonly referred to as "Community Loans." As an administrative matter, PCI and Friends agreed to fund the Friends Loan in several installments by deposit to a deposit account in the Fund's name maintained at the Credit Union (the "Operating Account"), each subsequent installment to be advanced after the Fund had utilized the previous advance to make Community Loans.

As security for the Friends Loan, PCI was granted a first priority perfected security interest in various assets of the Fund and Friends. The collateral securing the Friends Loan included, among other things:

---

RECEIPT
7100 8453 8130 0002 0457

FROM:
Bartlett Hackett Feinberg P.C.
RE: PCI Focus

DP:
PB: JLH/cic

SEND TO:
National Credit Union Administration
conservator for D. Edward Wells
Credit Union
864 State Street
Springfield MA 01109

FEES:
Postage           0.07
Certified Fee     2.30
Special           0.00
Restricted        0.00
Receipt           1.75

TOTAL           $ 4.42

POSTMARK OR DATE

---

RECEIPT
7100 8453 8130 0002 0440

FROM:
Bartlett Hackett Feinberg P.C.
RE: PCI/Focus

DP:
PB: JLH/cic

SEND TO:
Regional Director
National Credit Union Administration
9 Washington Square
Washington Avenue Extension
Albany NY 12205

FEES:
Postage           0.37
Certified Fee     2.30
Special           0.00
Restricted        0.00
Receipt           1.75

TOTAL           $ 4.42

POSTMARK OR DATE

05/21/03  WED 15:23 FAX 617 422 0383         BARTLETT HACKETTFEINBERG                    ☒003

National Credit Union Administration
May 5, 2003
Page 2

> (i)    the notes and collateral documents constituting the Community Loans;
>
> (ii)   a pledge of all amounts kept on deposit in the Loan Loss Reserve Deposit
>        Account (Account No. 80081) which the Loan Documents required be established
>        by Friends with the Credit Union and into which Friends was required to deposit a
>        minimum of ten percent (10.0%) of the principal balance of the Community
>        Loans (the "LLR Account"); and
>
> (iii)  a pledge of amounts on deposit in the Operating Account (Account No. 998859
>        maintained by the Friends with the Credit Union).  The Operating Account and
>        the LLR Account are sometimes collectively referred to herein as the "Deposit
>        Accounts".

These pledges were established pursuant to a Loan Loss Reserve Pledge Agreement and a
separate Pledge Agreement (collectively, the "Pledge Agreements") executed in connection with
the Friends Loan.  The Credit Union acknowledged the pledges of the Deposit Accounts to PCI
by joining as a party to each of the Pledge Agreements.

As a result of continuing events of default under the loan documents, on or about March 21 2003,
PCI sent notice to the Friends, the Credit Union and NCUA as conservator therefor of its election
to exercise the rights and remedies available to it under Sections 6 and 7 of the Pledge
Agreements and made demand upon the Friends and the Credit Union that all funds in on deposit
in the Deposit Accounts be returned to PCI.

Despite the Demand Letter, the amounts on deposit in the Deposit Accounts have to date not
been remitted.  Further, there has been no written response from the Credit Union or NCUA to the
Demand Letter.  In light of these failures, PCI has requested that this office contact the NCUA to
request that PCI's rights as a secured lender be promptly honored. In the alternative, we have
been asked to effectuate whatever procedure is necessary to provide for the prompt return of
PCI's collateral in the Deposit Accounts.  If a particular administrative procedure is required, we
hereby request that you direct us to that process. If we do not hear from you on or before May 21,
2003, as a last resort, we are prepared to take appropriate remedies against the Credit Union and
the NCUA as its Conservator, for conversion of PCI's collateral.

Very truly yours,

John L. Hackett, Jr.

cc:     The Friends of the Credit Union, Inc.
        Community Focus Loan Fund

**EXHIBIT F**

# pci

### The Property and Casualty Initiative

May 22, 2003

Conrad Wirries                                    **Certified Mail-Return Receipt Requested**
National Credit Union Administration
liquidating agent for the
D. Edward Wells Federal Credit Union
4807 Spice Wood Springs Road, #5100
Austin, TX  78759

RE: Demand for Release of Funds on deposit in account #'s 80081, 998859, 8859

Dear Mr. Wirries:

Thank you for taking my call on Tuesday. As you requested I am sending you copies of all the documents and letters that I have sent to NCUA over the last three months.  I hope that once you have reviewed the documents you will be able to expedite the release of the funds now on deposit in the above referenced accounts.

As I told you on the phone these funds represent all of the operating and loan capital for the FOCUS Fund.  The FOCUS Fund was established to provide financing for small business and not-for-profit organizations in the Springfield area that are unable to obtain financing from traditional lending sources. These businesses provide employment to low income residents and provide vital social services in an underserved market area.

The million dollars that PCI has to date advanced to the FOCUS Fund is the main source of capital for the Fund and NCUA's decision to freeze their accounts at the D. Edward Wells Federal Credit Union has effectively shut down the Fund.  Not only have they been unable to make the payments on the PCI loan that were due March, April and May 1, 2003, they have also not been able to honor their commitments to provide financing to three small businesses and one religious institution.

There will clearly be a financial void in the community as a result of the liquidation of the Credit Union.  The inability of the FOCUS Fund to continue operations because of the lack of capital is another hardship that is being borne by this community because of the actions of the NCUA.

The loan documents establishing the financing from PCI to the FOCUS Fund clearly show that the initial loan advance from PCI to the FOCUS Fund was transferred to accounts pledged to PCI as security for the loan to the FOCUS Fund.  The FOCUS Fund granted PCI a first security interest in those funds and the Credit Union acknowledged the security interest of PCI in those funds.  PCI has previously asserted its control over the funds by a letter to the Credit Union and NCUA dated March 21, 2003, which requested that the funds be released to PCI as secured party.  NCUA *did not respond* to PCI's demand letter or the subsequent demand sent by our attorney dated May 5, 2003.

I hope that after you have reviewed the enclosed documents you will agree that the correct action, both legally and ethically, is the release of the $630,865.25 to PCI. This would facilitate a cure of the existing defaults in the loan from PCI to the FOCUS Fund, which will allow the FOCUS Fund to continue to provide financing to businesses and organizations in the Springfield area.

Sincerely,

Stacey P. Townsend
Executive Director

xc:         M. Spruell
            J. Hackett


Enclosed:    1.  Demand Letter 3.21.03
             2.  Demand Letter 5.05.03
             3.  Promissory Note
             4.  Loan and Security Agreement
             5.  Pledge Agreement
             6.  Loan Loss Reserve Pledge Agreement
             7.  Wire transfer confirmation - Citizens Bank
             8.  Deposit Account Balances @ 3.21.03

**EXHIBIT G**

Mar.18. 2005  9:42AM  PCI                                No.8284   P. 2/5



**National Credit Union Administration**
**ASSET MANAGEMENT AND ASSISTANCE CENTER**

March 15, 2005

Stacey Parks Townsend
Executive Director
The Property and Casualty Initiative, LLC
148 State Street, Suite 620
Boston, MA 02110

Dear Ms. Townsend:

### D. Edward Wells Federal Credit Union

On November 17, 2004 the Liquidating Agent received a letter from the Community Focus Loan Fund ("CFLF") regarding their share accounts at D. Edward Wells Federal Credit Union ("Credit Union"). The letter directed the Liquidating Agent of the Credit Union to release any funds due to CFLF to the Property and Casualty Initiative, LLC (PCI). The Liquidating Agent has reconstructed the share accounts titled in the name of CFLF at the Credit Union and has made a determination of share insurance coverage.

In accordance with the National Credit Union Administration (NCUA) Regulations (12 C.F.R. Part 745) governing the payment of insured shares, CFLF is entitled to a total insurance payment of $100,000.00. Per CFLF's instructions, the Liquidating Agent is prepared to pay to PCI the $100,000.00 in insured shares due to CFLF as owner of the share accounts.

Since sending share insurance funds to someone other than the normal owner is not something the Liquidating Agent normally does, we have included a Release regarding the receipt of the share insurance. Please sign this Release and return it to the Liquidating Agent at your earliest convenience. Upon receipt of this Release, the Liquidating Agent will remit the $100,000.00 to you.

If you have any questions regarding your account, please contact Donald Klein at (512) 231-7902.

Sincerely,

Donald Klein
Deputy to the President

cc: Community Focus Loan Fund
AMAC/RDR:rdr
FCU #12787-2417
Enclosure

4807 Spicewood Springs Road - Suite 5100 - Austin, TX 78759-8490 - Office (512) 231-7900 - FAX (512) 231-7920

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| )<br>THE PROPERTY AND CASUALTY )<br>INITIATIVE, LLC, )<br>   Plaintiff, )<br>)<br>v. )<br>)<br>UNITED STATES OF AMERICA )<br>acting through the NATIONAL )<br>CREDIT UNION )<br>ADMINISTRATION, )<br>   Defendant ) | DOCKET NO. 05-10520-RCL |

## CERTIFICATE OF SERVICE

   I, Frank F. McGinn, hereby certify that on September 6, 2005, true and correct copies of

the Amended Verified Complaint were served on the individuals listed on the attached Service

List, electronically or by first class mail.


                     
Frank F. McGinn, BBO#564729
Bartlett Hackett Feinberg P.C.
10 High Street, Suite 920
Boston, MA 02110

**The Property and Casualty Initiative, LLC v. United States of America**
**Case No. 05-10520-RCL**

**Service List**


Gina Y. Walcott-Torres, Esq.
United States Attorney's Office
John Joseph Moakley Federal Courthouse
1 Courthouse Way, Suite 9200
Boston, MA  02210

Michael S. D'Orsi, Esq.
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd Floor
Boston, MA 02108