UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE PROPERTY AND CASUALTY INITIATIVE, LLC,<br>    Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA acting through the NATIONAL CREDIT UNION ADMINISTRATION,<br>    Defendant | DOCKET NO. 05-10520-RCL |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1) AND 12(b)(6)**

**I. Introduction**

The Plaintiff, The Property and Casualty Initiative, LLC ("PCI"), hereby files its opposition to the Defendant's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) And 12(b)(6) (the "Motion to Dismiss") and respectfully requests that this Court deny the relief sought therein. The Motion to Dismiss must be denied because as set forth below, the Amended Complaint ("Complaint") states valid actionable claims and jurisdiction is proper in this Court.

PCI brought this action to recover certain funds wrongfully withheld by the NCUA, while it was serving merely as the conservator of a credit union. In response to PCI's complaint, the NCUA filed a Motion to Dismiss. The crux of PCI's claims is that the NCUA failed to abide by its common law duties to PCI and ignored its enabling statute which provides most pertinently that the NCUA, "as conservator or liquidating agent, shall pay all valid obligations of the credit union in accordance with the prescriptions and limitations of this chapter." 12 U.S.C. sec. 1787(b)(2)(F). The Complaint and the attachments thereto demonstrate that the D. Edward Wells Federal Credit Union (the "Credit Union") owed certain obligations to PCI and that

NCUA while it was conservator (and later as Liquidator)[1] of the Credit Union neglected, failed and refused to honor those obligations of the Credit Union to PCI despite having received ample documentation of the legitimacy of PCI's claim and PCI's immediate entitlement to the funds at issue.

## II.  Factual Background

As set forth in the Complaint, PCI was formed as a result of certain enabling legislation (1998 Mass. Acts ch. 259, §3) as a vehicle for Massachusetts-based property and casualty insurance companies, to reinvest funds into the Commonwealth's low and moderate income communities. (Complaint ¶ 1).  Among its activities, PCI makes loans for low and moderate income housing developments, economic development projects, community health centers and small businesses located in Massachusetts.  (Complaint ¶ 1).  In accordance with its public purpose, in late 2000, PCI provided a revolving loan to the Community Focus Loan Fund (the "Fund") and The Friends of the Credit Union, Inc.  ("Friends") (the "Friends Loan") (Complaint ¶ 4).  Advances under the Friends Loan were to be used by the Fund and Friends to make small loans to people and businesses in the greater Springfield area.  These downstream loans are commonly referred to as "Community Loans."  (Complaint ¶ 5).

The funds advanced by PCI pursuant to the Friends Loan were to be held in a deposit account in the Fund's name maintained at the Credit Union (the "Operating Account"), until from time to time disbursed to fund Community Loans.  (Complaint ¶ 6).  As security for the Friends Loan, PCI was granted a first priority, perfected security interest in various assets of the Fund and Friends.  The collateral securing the Friends Loan included, among other things: (a) the

---

[1]  Whatever limitations on PCI's right to the funds at issue may have arisen once the NCUA's role changed from conservator to liquidator, such limitations did not exist during the nearly two months when the NCUA as conservator failed to respond to PCI's demand for the release of the funds.

notes and collateral documents constituting the Community Loans; (b) a pledge of all amounts kept on deposit in the Loan Loss Reserve Deposit Account; and (c) a pledge of amounts on deposit in the Operating Account maintained by the Friends with the Credit Union. (Complaint ¶ 7).

These pledges of collateral were established pursuant to certain Pledge Agreements executed in connection with the Friends Loan. (Complaint ¶ 8). The Credit Union acknowledged the pledges of the Deposit Accounts to PCI by joining as a party to each of the Pledge Agreements. By joining in the Pledge Agreements, the Credit Union agreed to immediately pay over to PCI, upon demand, any funds on deposit in the Deposit Accounts. (Complaint ¶ 9). Moreover, the documents to be produced in discovery will demonstrate that all of the corporate formalities necessary to establish the Credit Union's agreement to the terms of the Pledge Agreements were complied with.

The NCUA was appointed Conservator of the Credit Union on or about February 21, 2003. (Complaint ¶ 10). Shortly thereafter, on March 21, 2003, the then president of the Friends attempted to withdraw the funds held in its accounts at the Credit Union for the benefit of PCI. In response, he was told by an NCUA agent that the funds would not be released until the NCUA had verified the balances in the accounts. (Complaint ¶ 11). He then requested from the NCUA agent a printout of the balances in the accounts as of that date, which the NCUA agent did, indicating that the accounts at issue contained $630,865.25. (Complaint ¶ 12). Later, on or about March 21, 2003, PCI sent notice to the Friends, the Credit Union, and NCUA as Conservator that it (PCI) elected to exercise its rights and remedies under the Pledge Agreements, and made demand upon the Friends and the Credit Union that all funds on deposit

in the Deposit Accounts be paid immediately to PCI. (Complaint ¶ 13). Despite these demands, the funds were not released.

On May 5, 2003, PCI again made demand upon the NCUA, as Conservator of the Credit Union, for payment of all amounts on deposit in the Deposit Accounts. (Complaint ¶ 14). In response to PCI's written and oral requests for release of its funds, the NCUA as Conservator of the Credit Union made promises of an imminent release of the funds, but requested that PCI file additional forms or direct its requests to different individuals at the NCUA. (Complaint ¶ 15). Ultimately, PCI's demands regarding the funds on deposit were ignored and disregarded by the NCUA while it was serving as Conservator of the Credit Union and the funds at issue were never released. (Complaint ¶ 16).

On or about May 17, 2003, the NCUA ceased serving as Conservator and became the Liquidator of the Credit Union. (Complaint ¶ 19). The NCUA then took the position that it no longer had any responsibility to honor PCI's or the Fund's claim to the funds in the depository accounts of the Credit Union and that even if it were obligated to do so, its duty was limited by the $100,000 insurance cap for depositors of failed financial institutions. (Complaint ¶ 19). Ultimately the refusal and failure of the NCUA to release the pledged funds it was holding to PCI precipitated this litigation.

In this litigation, PCI has raised various legal theories, all of which stem from one undeniable reality. The NCUA refused to act upon PCI's claim for some two months refusing to return to PCI the funds which indisputably belonged to it under the Pledge Agreements. (Complaint Exhibits A and B). Then when it became the Liquidator of the Credit Union, the NCUA claimed that it was now legally barred from releasing PCI's funds, except for maybe the

insured portion of $100,000.[2]  It is PCI's position as detailed in the Complaint that the

government cannot wrongfully sequester property not belonging to it, until it is in a position

where it can "officially" withhold it.

### III. Argument

A.    SUBItMATTER JURISDICTION

    1.  This Court Possesses Subject Matter Jurisdiction over PCI's Tort Claims Because PCI
        Satisfied the Jurisdictional Requirements of the FTCA by Making Written Demand on
        the NCUA

This Court has subject matter jurisdiction over the Plaintiff's FTCA claims.  See

Santiago-Ramirez v. Secretary of Dep't of Defense, 984 F.2d 16, 18-20 (1st Cir. 1993).  As

the First Circuit stated in Santiago-Ramirez, a plaintiff is understood to have "satisfied the

notice requirement of section 2675 if he or she provides a claim form or "other written

notification" which includes (1) sufficient information for the agency to investigate the

claims, and (2) the amount of damages sought."  Id. at 19, citing Lopez v. United States, 758

F.2d 806 (1st Cir. 1985).

As set forth in the Complaint, on or about March 21, 2003, PCI sent notice to the NCUA

as Conservator that it (PCI) elected to exercise its rights and remedies under Sections 6 and 7

of the Pledge Agreements, and made demand upon the Friends and the Credit Union that all

funds on deposit in the Deposit Accounts be paid immediately to PCI.  A copy of the March

21 demand is attached to the Complaint as Exhibit "D."  On May 5, 2003, PCI again made

demand upon the NCUA, as Conservator of the Credit Union, for payment of all amounts on

---

[2]  Even this smaller amount ostensibly federally insured under Section 207 of the FCU Act (12 U.S.C. §1787(k)(1))
and Part 745 of the NCUA Rules and Regulations (12 C.F.R 745) has not yet been paid to PCI for reasons that have
never been made clear.  In fact, the one time the NCUA proposed paying the federally insured amount, they
conditioned such offer upon PCI executing a full release of all claims against the NCUA. (See Complaint, Exhibit
G).  Certainly were a private party to condition release of indisputably owing funds, upon the release of claims to
disputed funds, it would be guilty of engaging in unfair and deceptive acts and practices.

deposit in the Deposit Accounts.  A copy of the May 5 demand is attached to the Complaint as Exhibit "E."

These demands satisfy the administrative claim requirements of the FTCA.  See Baez v. United States, 976 F. Supp. 102, 105 (D.P.R. 1997) (plaintiff's demand letters to SBA satisfied jurisdictional requirements of §2675, though suit was time-barred).  Moreover, as noted in Booten v. United States, 95 F. Supp. 2d 37, 46-47 (D. Mass. 2000), "[w]hile the statutory notice requirements of Section 2675 coincide with the presentment requirements in 28 C.F.R. § 14.2(a), the Court of Appeals for the First Circuit has followed the general shift among all circuits in acknowledging that the additional information requested by 28 C.F.R. §§ 14.1-14.11 is not relevant for the jurisdictional notice requirements of Section 2675." Citing Lopez v. United States,758 F.2d 806 (1st Cir.1985); GAF Corp. v. United States, 818 F.2d 901, 919 (D.C.Cir.1987); Johnson v. United States, 788 F.2d 845, 848 (2nd Cir.1986), cert. denied, 479 U.S. 914;  Tucker v. United States Postal Serv., 676 F.2d 954, 959 (3rd Cir.1982); Adams v. United States, 615 F.2d 284, 288-89 (5th Cir.1980); Douglas v. United States, 658 F.2d 445, 447 (6th Cir.1981); Charlton v. United States, 743 F.2d 557, 561 (7th Cir.1984); Farmers State Sav. Bank v.Farmers Home Admin., 866 F.2d 276 (8th Cir.1989); Warren v. United States Dep't of Interior Bureau of Land Management, 724 F.2d 776, 780 (9th Cir.1984); Bush v. United States, 703 F.2d 491, 494 (11th Cir.1983).

Even a cursory review of Exhibits D, E and F to the Complaint reveals that PCI satisfied the notice requirements delineated above.  Rather than attempt to identify a deficiency in the form of notice, NCUA has instead chosen simply to ignore these demand letters.  In particular, NCUA has introduced a declaration from an NCUA attorney in Albany, New York stating that he has "determined that NCUA has no record of any tort administrative

6

claim filed by the Property and Casualty Initiative." (Declaration of Allan Meltzer at ¶ 2).
Mr. Meltzer does not even address Exhibits D, E and F to the Complaint or explain why they
are deficient. Nor does Mr. Meltzer discuss the fact that NCUA instructed PCI to file its
claims in Austin, Texas and subsequently acknowledged the timely filing of PCI's claim.
(See NCUA letters dated May 23, 2003 and August 6, 2003, true copies of which are
attached hereto as Exhibits "A" and "B," respectively). Succinctly, the Meltzer Declaration
is misinformed and does not carry any credibility.[3]

As detailed in the Complaint, NCUA received and acknowledged PCI's tort demands,
retained outside counsel and engaged in lengthy settlement discussions with PCI's counsel.
Accordingly, not only did the letters (Complaint, Exhibits D, E and F) satisfy the technical
requirements of the FTCA, but they also elicited the precise situation that §2675 was
intended to foster – "to balance the goal of efficiently encouraging settlement between the
agency and the claimant with the desire to provide "fair and equitable treatment of private
individuals and claimants when they deal with the Government or are involved in litigation
with their Government." Santiago-Ramirez at 18, (quoting legislative history of §2675), S.
Rep. No. 1327, 89th Cong., 2d Sess. 2, reprinted in 1966 USCCAN 2515, 2516.

In sum, PCI satisfied the claim requirements of §2675 and NCUA's prior conduct and
written acknowledgement confirm that NCUA received adequate notice of PCI's claims.

---

[3] To the extent a dispute exists as to whether or not an administrative claim was filed, such disputes are not properly
resolved on a motion to dismiss. The Complaint alleges compliance with the FTCA notice requirements. That, in
and of itself, should be dispositive of the issue at this stage of the proceedings. Day v. Mass. Air Nat'l Guard, 167 F.
3 678 (1st Cir. 1999).

2.  This Court Possesses Subject Matter Jurisdiction Over PCI's Claims for Negligence, Breach of Fiduciary Duty and Conversion under the FTCA

PCI's negligence, breach of fiduciary duty and conversion claims are not excepted from the FTCA waiver of sovereign immunity embodied in 28 U.S.C. §2680(h) which provides in pertinent part as follows:

The provisions of this chapter and section 1346(b) of this title shall not apply to—

> … (h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

PCI's negligence, breach of fiduciary duty and conversion claims are not barred by this provision. NCUA has attempted to classify PCI's breach of fiduciary duty and conversion claims as disguised contract claims which should be barred under §2680(h). However, §2680(h), upon which NCUA relies, bars claims alleging interference with contract. See id. No claim for contractual interference has been asserted here. There is no claim that the NCUA used wrongful means to cause or with improper motives caused the Credit Union to breach its contractual commitments to PCI. See United Truck Leasing Corp. v. Geltman, 406 Mass. 811 (1990) (setting forth prima facie elements of contractual interference claim under Massachusetts law). Section 2680(h) does not bar claims relating to NCUA's torts committed while standing in the shoes of a contract counterparty. In any case, PCI's claims are based on NCUA's independent breaches of its common law and statutory duties to PCI. Even though PCI's property rights arose out of a contractual relationship with the Credit Union, NCUA's negligence, breach of fiduciary duty and conversion are actionable under

the FTCA.[4]  See Shock v. United States, 56 F. Supp. 2d 185 (D.R.I. 1999) (negligence); Love

v. United States, 915 F.2d 1242, 1248 (9th Cir. 1990) (agency's failure to abide by statutory

duty as lender constituted actionable breach of fiduciary duty under FTCA); Marlys Bear

Medicine v. United States, 241 F.3d 1208, 1218-19 (9th Cir. 2001) (breach of fiduciary duty);

Nottingham, Ltd. V. United States, 741 F. Supp. 1447 (D. C.D. Cal. 1990) (conversion).

Accordingly, this Court possesses subject matter jurisdiction over PCI's tort claims.

Likewise, this Court possesses subject matter jurisdiction over PCI's Constitutional claims

pursuant to 28 U.S.C. § 1331 and 12 U.S.C. § 1789(a)(2), which provides that the NCUA

may sue and be sued in any court of law or equity, State or Federal.

B. PCI'S CLAIMS ARE NOT BARRED BY THE COMMON LAW D'OENCH
   DOCTRINE OR THE "STATUTORY D'OENCH DOCTRINE" EMBODIED IN 12
   U.S.C. §§. 1787(B)(9)(A) AND 1788(A)(3)

   PCI's claims are not barred by 12 U.S.C. sec. 1787(b)(9)(A) and 1788(a)(3), which

essentially comprise a statutory version of the common law D'Oench doctrine discussed

infra.  The statutory and common law D'Oench doctrines asserted by the government are not

applicable to depositor/member attempts to obtain their funds from lending institutions.  See

Villafane-Neriz v. Federal Deposit Ins. Co., 20 F.3d 35, 39-40 (1st Cir. 1994) (discussing the

crucial but somewhat counterintuitive treatment of customer deposits as bank liabilities,

while loans to borrowers are considered bank assets).  In Villafane, an insurance

commissioner received an assignment of a certificate of deposit issued by a failed bank.

When the commissioner sought to collect the CD, the FDIC argued that the assignment of the

CD was barred by the statutory counterpart to the D'Oench doctrine applicable to banks.  The

---

[4] While the Credit Union may have owed contractual duties to PCI, the NCUA's wrongful failure to honor its own
and its ward's (the Credit Union) obligations resulted in the NCUA itself engaging in tortuous conduct, classifiable
as negligence, breach of fiduciary duty and/or conversion.

First Circuit held that the relevant assignment and associated agreements had an effect on one of the bank's deposits "rather than one of its assets." Id. at 40. The Court therefore ruled that the statutory D'Oench doctrine was not applicable. Like the insurance commissioner in Villafane, PCI's claim relates to a pledge of a deposit of the Credit Union and not to one of its assets, i.e., a loan relationship. Accordingly, like the plaintiff in Villafane, neither the common law nor the statutory D'Oench doctrines apply.

The cases cited by the defendants invariably relate to borrowers' and guarantors' efforts to avoid their obligations to lending institutions. The case before this Court is the opposite – the NCUA standing in the shoes of the lending institution is attempting to avoid its statutory duty under §1787(b)(2)(F) to honor the Credit Union's obligation to pay a liability to PCI. The protections afforded to liquating agents such as the NCUA apply to acquired assets – not liabilities.[5] The statute plainly states as much:

> (a) Loans; purchase of assets; accounts; agreements affecting interest of Board in any asset acquired by it
>
> **(3)** No agreement which tends to diminish or defeat the right, title, or interest of the Board, in any asset acquired by it under this subsection, either as security for a loan or by purchase, shall be valid against the Board unless such agreement--
>
> **(A)** shall be in writing;
>
> **(B)** shall have been executed by the credit union and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the credit union;
>
> **(C)** shall have been approved by the board of directors of the credit union, which approval shall be reflected in the minutes of such board;  and
>
> **(D)** shall have been continuously, from the time of its execution, an official record of the credit union.

---

[5] As stated previously, in bank accounting, accounts of depositors are deemed liabilities of the bank, i.e., they are owed to the customer by the bank, whereas the bank's loans are its assets. See Villafane, supra.

12 U.S.C. § 1788(a)(3) (emphasis added).

To interpret the statute to mean otherwise would result in an absurd and unwieldy requirement that every passbook, account agreement and certificate of deposit be approved by the board of directors with such approval reflected in the minutes of the board. If NCUA's position that D'Oench applies to depositor/member attempts to obtain their funds from Credit Unions prior to liquidation, then the substantial body of case law honing the finer points of the D'Oench doctrine would be replete with determinations regarding the sufficiency or insufficiency of depositors' written evidence of their account agreements (duly noted in the corporate minutes by vote of the directors of the lending institution). The reason why there is a dearth of any such cases is quite simple – D'Oench relates to the receiver/liquidator's acquisition of assets – not liabilities. At issue in this case are the Credit Union's liabilities (deposit accounts) to PCI.

PCI's claims against NCUA do not allege some side agreement as a defense to collection on a loan or guaranty. In fact, PCI is not bringing a contract action at all. Instead, PCI's claims against NCUA relate to its failure, as conservator, to turn over the funds to PCI (conversion) which failure also constituted a breach of NCUA's statutory duty (breach of fiduciary duty) and its common law duty of care (breach of fiduciary duty and negligence). Accordingly, it should come as no surprise that §§1787(b)(9)(A) and 1788(a)(3) must fail because PCI's claims do not diminish any <u>asset</u> or defeat any right title or interest of the NCUA in any asset it acquired under §1788 and the claim is not in essence a contract claim.

The fundamental flaw in the NCUA's statutory and common law D'Oench arguments is the failure to recognize that the NCUA had no basis in fact or at law to disregard the clear instructions and directions from PCI to release the deposited funds prior to its appointment as

11

Liquidator. When it became conservator in February of 2003, the NCUA assured the Credit Union members that they could "continue to conduct normal financial transactions, deposit and access funds, make loan payments and use share drafts (checking)." (See Exhibit C hereto). As Exhibits D, E and F to the Complaint make clear, PCI repeatedly attempted to conduct just such a normal transaction – withdrawing funds from the Credit Union. Though the NCUA had no power as conservator to dishonor such requests, it did so anyway. Though NCUA was specifically charged with honoring such obligations, it did not.[6]

Once the NCUA became the Liquidator of the Credit Union in May, 2003, it ultimately took the position that it no longer had any responsibility to honor PCI's or the Fund's claim to the funds in the depository accounts of the Credit Union and that even if it were obligated to do so, its duty was limited by the $100,000 insurance guaranty for depositors of failed financial institutions. NCUA has never explained why it failed to allow PCI's valid timely request for the deposited funds prior to NCUA's appointment as liquidator. Given its clear statutory directive to honor all valid obligations, NCUA can never point to a justification, though negligence might serve as an excuse.

NCUA's attempts to wash away its wrongful acts through a common law or statutory D'Oench defense should fare no better than its attempt to wish away the claim notices attached to the Complaint. Moreover, even if the D'Oench doctrine were applicable to depositor/members' rights to payment on their accounts, PCI's case would be the rare one in which the onerous record keeping requirements of D'Oench would be satisfied. Even if the wrongfully withheld funds were considered to be assets of the Credit Union, the Loan Loss Reserve Pledge Agreement and a separate Pledge Agreement (collectively, the "Pledge

---

[6] The D'Oench doctrine has no place when a regulatory agency is acting as conservator, as opposed to serving as liquidator.

Agreements") executed in connection with the Friends Loan (see Complaint, Exhibits A and B, respectively), were duly authorized by the Credit Union which acknowledged the pledges of the Deposit Accounts to PCI by joining as a party to each of the Pledge Agreements. By joining in the Pledge Agreements, the Credit Union agreed to immediately pay over to PCI, upon demand, any funds on deposit in the Deposit Accounts. The Credit Union board authorized execution of the Pledge Agreements in a written vote (a copy of which is attached hereto as Exhibit "D").

The NCUA now claims that it possesses no records of the Credit Union containing this vote of the board of the Credit Union. At this pre-discovery stage of the litigation NCUA's categorical denial would appear premature. PCI would note that once discovery commences, NCUA will receive from PCI, among other things, a copy of the formal legal opinion from the Credit Union's counsel stating that the Credit Union possessed authority to enter into the transactions and documents at issue in this case. It would be surprising indeed if this opinion and vote were not kept by the Credit Union. It is possible that the vote and pledge agreements were lost or spoliated while the Credit Union books and records were in the care and custody of NCUA. To the extent that the records of the Credit Union have been lost or destroyed while in the care of the NCUA[7], then this Court would be entitled to infer that the corporate minutes did contain the aforementioned vote. See Wiedmann v. The Bradford Group, 444 Mass. 698 (2005) (setting forth range of remedies available in spoliation cases).

---

[7] PCI has been told by former Credit Union employees that the books, records and documents of the Credit Union were routinely discarded at the NCUA's direction after the liquidation process began. The NCUA also advised PCI that the hard drives of the Credit Union's computers had been wiped clean of any and all data. Certainly this possible destruction of evidence will be the subject of discovery in this case.

C. THE NCUA TOOK PCI'S MONEY IN VIOLATION OF THE FIFTH AMENDMENT

By depriving the Plaintiff of its funds unjustifiably and in derogation of its statutory

obligations, the NCUA, and the individuals at the NCUA who took such action, violated the

Plaintiff's rights under the Fifth Amendment of the United States Constitution. The

government states that PCI's property interest is not sufficient to warrant Constitutional

protections, but the Defendant fails to explain how PCI's rights to specific funds in a specific

account in a still-operating, pre-liquidation credit union are not the kind of property entitled

to protection under the Fifth Amendment of the Constitution.

Though NCUA representatives initially informed PCI and/or the Fund that that funds in

the Credit Union accounts at issue in this case contained approximately $630,000, NCUA's

counsel recently reported that NCUA now believes that the pledged accounts to which PCI

had an immediate right contained only approximately $530,000 at the time PCI sent its

March 2003, demand to NCUA acting as conservator. Whether the correct figure is

$630,000 or $530,000, there is no disagreement now that the Credit Union held more than a

half million dollars in the pledged accounts when PCI first demanded payment. As noted

previously, the Pledge Agreements were duly authorized and executed by the Credit Union

with the approval of its board and the Pledge Agreements unambiguously required the Credit

Union to release the funds to PCI on proper demand.

PCI knows of no entity other than NCUA that has or would question the immediate

unassailable property right in and to the pledged account funds. PCI complied with all legal

requirements to perfect its security interest in the accounts and the funds therein. Given the

ironclad documentation of its property rights in and to the wrongfully withheld funds, the

only surprise to PCI is NCUA's continued inability or unwillingness to recognize the obvious

14

– the funds belonged to somebody <u>other than</u> the Credit Union or NCUA when the conservatorship was commenced. NCUA has not and cannot point to any passage of title or other conveyance that would have vested title to the funds in the Credit Union, NCUA or anyone else. If PCI was not entitled to the pledged account funds, then whose funds were they? The funds certainly did not become NCUA's property by operation of law when the conservatorship was commenced. Though NCUA believes it is now entitled to the funds because it is protected as a liquidator, it reached this position by ignoring and failing to honor its statutory and common law duties to PCI, before it assumed the status of liquidator.

Whether through ineptitude or recklessness, the NCUA effectively took PCI's money. Money is the quintessential property interest. NCUA took the property without paying any compensation to PCI.

WHEREFORE, the Plaintiff, The Property and Casualty Initiative, LLC, requests that the Court:

1.      Enter an order denying the Defendant's motion to dismiss;

2.      Enter judgment in its favor and against the Defendant, United States of America acting through the National Credit Union Administration, in the amount of all damages sustained, including but not limited to the amount of funds in the Deposit Accounts on March 21, 2003, at the time of the initial demand;

3.      Enter an injunction requiring the Defendant, United States of America acting through the National Credit Union Administration, release to the plaintiff the funds in the Deposit Accounts on March 21, 2003, at the time of the initial demand;

4.      Award the Plaintiff its attorneys' fees against the NCUA; and

5.      Grant such other relief as is just.

15

The Property and Casualty Initiative, LLC

By its attorneys,

Richard E. Gentilli (BBO # 189080)
Frank F. McGinn (BBO # 564729)
Bartlett Hackett Feinberg P.C.
155 Federal Street, 9th Floor
Boston, MA 02110
617/422-0200

Dated: *October 20, 2005*

CERTIFICATE OF SERVICE
I hereby certify that on this day
a true copy of the above document
was served upon the attorney of
record for each party by mail/by hand

DATED: *October 20, 2005*

16

# EXHIBIT A



## National Credit Union Administration
### ASSET MANAGEMENT AND ASSISTANCE CENTER

May 23, 2003

The Property and Casualty Initiative
148 State Street, Suite 620
Boston, MA  02109

Liquidation of D. Edward Wells Federal Credit Union

To Whom it may Concern:

You have until August 25, 2003, to submit claims against the D. Edward Wells Federal Credit Union, 864 State Street, Springfield MA  01109.  The National Credit Union Administration Board placed the credit union in liquidation on May 17, 2003.  In order to make a claim on the assets of the credit union, you must submit, in writing, documentation to our Texas office.

Submit your claims to:

    National Credit Union Administration
    Asset Management and Assistance Center
    4807 Spicewood Springs Road, Suite 5100
    Austin, TX  78759

We have enclosed a copy of the liquidation notice published in the local newspapers.

Thank you for your attention to this matter.

    Sincerely,

    Conrad Wirries
    Agent for the Liquidating Agent
    512 - 231-7900  x 7037

DLMS\CW:cw
Case 2417
Enclosure

National Credit Union Administration
ASSET MANAGEMENT AND ASSISTANCE CENTER

# LIQUIDATION NOTICE TO CREDITORS OF D. EDWARD WELLS FEDERAL CREDIT UNION

The National Credit Union Administration Board placed the D. Edward Wells Federal Credit Union, Charter No. 12787, 864 State Street, Springfield, MA 01109, into involuntary liquidation pursuant to its authority under Section 207 (a) (1) (A) of the Federal Credit Union Act.

All creditors having any claim or demand against D. Edward Wells Federal Credit Union must submit their claim or demand in writing, together with proof, by August 25, 2003. All such claims or demands must be sent to the following address:

> National Credit Union Administration
> Liquidating Agent for the D. Edward Wells Federal Credit Union
> 4807 Spicewood Springs Road, Suite 5100
> Austin, Texas 78759
>
>                                  Tel. No. (512) 231-7900

Claims or demands filed after August 25, 2003, may be barred due to untimely submission.

# EXHIBIT B

National Credit Union Administration
ASSET MANAGEMENT AND ASSISTANCE CENTER

August 6, 2003

John Hackett, Esq.
Bartlett Hackett Feinberg P.C.
10 High Street, Suite 920
Boston, Massachusetts 02110

> D. Edward Wells Federal Credit Union –
> Claim Against the Liquidating Agent On
> Behalf of The Property and Casualty
> Initiative, LLC

Dear Mr. Hackett:

I am a Staff Attorney with the Office of General Counsel of the National Credit Union
Administration ("NCUA"). As you probably already know, the NCUA is an independent
federal agency in the executive branch of the United States Government charged with
chartering, regulating and insuring federally chartered credit unions. John Ianno, a Trial
Attorney in the Office of General Counsel of the NCUA has informed me that you are
desirous of confirmation of the receipt of your client's claim against the liquidation estate
of D. Edward Wells Federal Credit Union ("Credit Union") by the liquidating agent.

Conrad Wirries of the NCUA's Asset Management and Assistance Center ("AMAC") in
Austin, Texas assures me that your client's claim was received by the liquidating agent
well within any applicable filing deadlines. AMAC is the division within the NCUA that
handles the day to day liquidation of those credit unions placed into involuntary
liquidation by the NCUA. The NCUA placed the Credit Union into involuntarily
liquidation on May 17, 2003 and named itself as the liquidating agent pursuant to its
authority under the provisions of 12 U.S.C. §1787.

The liquidating agent will review your client's claim to determine whether it should be
allowed or disallowed. It will be guided in this matter by the provisions of 12 U.S.C.
§1787 and 12 C.F.R. Parts 709 and 745. If AMAC, acting on behalf of the liquidating
agent, has any questions regarding your client's claim or requires any additional
information, they will contact you directly. If you have any questions in this regard,
please contact me at the following address:

John Hackett, Esq.
August 6, 2003
Page Two


National Credit Union Administration
Asset Management and Assistance Center
Attention: Robert D. Roach, Staff Attorney
4807 Spicewood Springs Road, Suite 5100
Austin, Texas 78759-8490


Sincerely,

Robert D. Roach
Staff Attorney


AMAC/RDR:rdr
FCU: 12787-2417

cc:    Associate General Counsel Allan H. Meltzer
       Trial Attorney John Ianno
       Director Jennifer Murphy, Division of Liquidation and Member Services
       Peter Gelhaar, Esq.
       Michael D'Orsi, Esq.

# EXHIBIT C



**For Details, Contact:**
**Public & Congressional Affairs**
email: pacamail@ncua.gov
Fax: (703) 518-6409

**National Credit Union Administration**
1775 Duke Street
Alexandria, VA 22314-3428
Phone: (703) 518-6330
Web Address: http://www.ncua.gov

# NCUA News Release

### FOR IMMEDIATE RELEASE

## *Service Uninterrupted as Massachusetts Credit Union is Placed into Conservatorship by National Credit Union Administration*

### Member Accounts are Safe and Insured up to $100,000 at D. Edward Wells Federal Credit Union

**February 21, 2003, Alexandria, Va.** □ The National Credit Union Administration (NCUA) today assumed control of service and operations at D. Edward **Wells Federal Credit Union** in Springfield, Mass. The credit union is in operation and service continues uninterrupted for its 2600 members. Members can continue to conduct normal financial transactions □ deposit and access funds, make loan payments and use share drafts (checking).

The decision to conserve a credit union is made with the goal of continuing service to members at a safe and sound institution.

Member funds are safe. Member accounts are insured up to $100,000 by the National Credit Union Share Insurance Fund (NCUSIF), a federal fund managed by NCUA and backed by the full faith and credit of the U.S. government.

The Federal Credit Union Act authorizes the NCUA Board to appoint itself conservator when necessary to conserve the assets of a federally insured credit union, protect the interests of members or protect the NCUSIF.

The D. Edward **Wells Federal Credit Union** was placed into conservatorship for failing to provide full access to its books and records and serious operational deficiencies, including unreconciled financial records and failure to comply with the Federal Credit Union Act and NCUA Rules and Regulations.

The National Credit Union Administration, governed by a three-member board appointed by the President and confirmed by the Senate, is the independent federal agency that regulates, charters and supervises federal credit unions. NCUA, with the backing of the full faith and credit of the U.S. government, operates and manages the National Credit Union Share Insurance Fund, insuring the deposits of more than 80 million account holders in all federal credit unions and the overwhelming majority of state-chartered credit unions.

# EXHIBIT D

# CLERK'S CERTIFICATE

I, the undersigned Clerk of D. EDWARD WELLS FEDERAL CREDIT UNION, with a

principal place of business at 864 Street, Springfield, Massachusetts, hereby certify that all of the

Directors of the Organization voted as follows:

**VOTED:**    That Carol Aranjo, President of this Organization, be and she hereby is authorized
and directed for and on behalf of this Organization to enter into the Community
Focus Loan Fund Operating Agreement with Mason Square Community
Development Organization, Friends of the Credit Union, Inc. and Brightwood
Development Organization (the "Operating Agreement"), and in connection
therewith the President of this Organization is authorized and directed for and on
behalf of this Organization to execute such other agreements, certificates,
instruments or documents as may be required to obtain the funding contemplated
by the Operating Agreement (collectively, the "Operating Agreement
Documents"), with the actual Operating Agreement Documents executed by the
President of this Organization deemed to be the Operating Agreement Documents
approved by this vote.

William Zachery
                                        Clerk

Dated: September 30, 2000

66601-1